**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JOAN SHAGES, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-CV-5395 |
| | ) | |
| MDSCRIPTS INC., a Florida corporation, and | ) | |
| GARY MOUNCE, an individual | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT FOR VIOLATION OF THE FAIR LABOR STANDARDS
ACT AND STATE WAGE & HOUR LAWS**

Plaintiff, Joan Shages, states as follows for her complaint against defendants, MD Scripts and Gary Mounce:

**PRELIMINARY STATEMENT**

Defendants, MDScripts Inc. ("MDScripts") and Gary Mounce ("Mr. Mounce" who with MDScripts are collectively, "Defendants") employed plaintiff, Joan Shages ("Joan") from approximately June 2014 until January 24, 2018. When defendants hired Joan, they promised her that the value of her salary, bonuses and profit sharing would total at least $75,000 annually. Despite repeatedly promising such bonuses, Defendants did not keep that promise. Further, after initially paying Joan a flat salary of $60,000, on July 31, 2015, defendants specifically directed that plaintiff would be paid on an hourly basis. Although Defendants required Joan to work in excess of 40 hours per week, Defendants failed to pay Joan the full amount of overtime due in violation of the federal Fair Labor Standards Act, 29 U.S.C. § 201, et seq. (FSLA) and state wage and hour laws. Last January, Joan confronted Defendants about their failure to pay her wages and in retaliation for such complaint, they terminated her in violation of the FSLA and state labor laws.

## PARTIES

1.      Plaintiff, Joan Shages, currently resides in Lake Geneva, Wisconsin.  During the majority of the relevant time period, however, she worked for defendants from her home in Rockton, Illinois.   During her employment with defendants, Joan was employed as a relationship/account manager, a trainer and help desk agent from approximately June 2015 to January 24, 2018.

2.      Defendant MDScripts, Inc.  is a Florida corporation with offices at 8930 State Road 84 #222, Davie, FL  33324.  MDScripts has annual sales totaling $500,000 or more and is engaged in interstate commerce.  MDScripts provides, *inter alia*, software and service solution used by providers in dispensing prescription medications (MDScripts), managing medical billing (RxBilling), collecting and processing lab samples to reports (MDPatients), State Controlled Substance Reporting (PDPMReport), Network licensing with PBM's/PSAO (MDSRx), Dental Network (Sun Dental).

3.      Defendant Gary Mounce is the President and CEO of MDScripts who exercised operational control over its employees, including Joan, and had the power to hire and fire them, the ability to supervise them, and the power to set wages for them.

4.      Because Mr. Mounce exercises such control over MDScripts employees, including Joan, he is deemed an "employer" under the FLSA and applicable state wage and hour laws.

## JURISDICTION AND VENUE

5.      This Court has original federal question jurisdiction under 28 U.S.C. § 1331 for the claims brought under the FLSA.

6.      Federal jurisdiction is proper under the enterprise coverage of the FLSA because MDScripts and Mr. Mounce are each an "employer" within the meaning of the FLSA.   As

employers, MDScripts and Mr. Mounce have employees servicing accounts in interstate commerce. By way of example and without limitation, MDScripts's employees sold services and and serviced customers located in this district. In addition, MDScripts's annual gross volume of sales made is not less than $500,000.

7.     At all relevant times, MDScripts and Mr. Mounce have been and continue to be, an "employer" engaged in the interstate "commerce" and/or in the production of "goods" for "commerce" within the meaning of the FLSA, 29 U.S.C. § 203. MDScripts and Mr. Mounce and are collectively referred to as the "Defendants."

8.     Likewise, at all relevant times, Defendants were each an "employer" as defined under the Illinois Minimum Wage Law, 820 ILCS § 105/3(c). At all relevant times, Defendants employed Joan as an "employee" under the Illinois Minimum Wage Law, 820 ILCS § 105/3(d).

9.     At all relevant times, Defendants employed employees such as Joan. At all relevant times, Defendants have had gross operating revenues in excess of $500,000.00, which is the threshold test for the "enterprise" requirement under the FLSA.

10.     This Court has supplemental jurisdiction over Joan's state claims pursuant to 28 U.S.C. 1367 because they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy," the state and federal claims derive from a common nucleus of operative fact, the state claims will not substantially dominate over the FLSA claims, and exercising supplemental jurisdiction would be in the interests of judicial economy, convenience, fairness, and comity.

11.     The United States District Court for the Northern District of Illinois has personal jurisdiction because MDScripts and Mr. Mounce conducted business within this District.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as MDScripts and Mr. Mounce recruited Joan in Illinois, employed Joan in Illinois, and transacted business in Illinois; and, the causes of action set forth herein have arisen and occurred in part in the Northern District of Illinois.

13.     At all relevant times, Defendants were each an "employer" as defined under the Illinois Minimum Wage Law, 820 ILCS § 105/3(c). At all relevant times, Defendants employed Joan as an "employee" under the Illinois Minimum Wage Law, 820 ILCS § 105/3(d).

**FACTUAL ALLEGATIONS**
**Joan's Professional Background**

14.     Joan is a highly-trained and skilled professional who attended the University of Kansas as a premed student.  After leaving university in December of 1994, she took a part time job with Pizza Hut (then owned by PepsiCo), which turned into a four-year management appointment.  As a manager, Joan completed PepsiCo's intense, six-month campus-based BMT (Basic Management Training) Program.

15.     Joan left Pizza Hut in 1998 to relocate to Greece, where she worked for Pro Services Inc. as an international sales manager with a staff of 12.  Joan left Services in 2007 when she returned to the United States.  That year, Joan returned to school for additional clinical education and training and completed courses for her CPT (certified in Phlebotomy and Toxicology) and as a rescue-level medical assistant.   She worked as a PRN Phlebotomist at Kishwaukee Hospital in Sycamore, IL while attending school and later took a position with JPMorgan which highlighted a significant salary and benefits increase.   At JPMorgan received additional management training.

16.     After serving at JPMorgan, Joan went to A-S Medication Solutions, LLC ("A-S"), a prescription drug dispensing solutions provider located in Illinois, which allowed Joan to use her

clinical education and background as well as her business experience.  A-S was a customer of MDScripts.

17.    While at A-S, Joan became proficient in MDScripts's software.  In the spring of 2014, Joan approached MDScripts' Gary Mounce regarding a mutual client, he was so impressed with Joan that he offered her a position with his company, luring her away from A-S.

### *MDScripts' Unkept Compensation Promises*

18.    When Joan negotiated her starting salary with MDScripts in 2014, Joan demanded a starting salary of $75,000/yr. salary, which, based on Joan's research, was the <u>lowest</u> starting compensation package for a Senior Relationship Manager with a background similar to Joan's.

19.    MDScripts agreed to pay $75,000, but based on a $60,000 base salary, with the difference made up in in bonuses and profit sharing.  MDScripts stated to Joan that compensation would never be an issue at MDScripts and that "raises, bonuses and profit sharing were frequent and generous if earned."  MDScripts also promised that Joan would receive sick days and vacation pay.

20.    In reliance on MDScripts' verbal commitments, in or about June 2014, Joan agreed to those terms and commenced work as MDScripts' Senior Relationship Manager, Direct Accounts, MDPatients (toxicology platform).   Joan was responsible for all commission allocations, site and organizational onboarding, lab management, software installs and monthly payouts.

21.    In or about November 2014, after several unanswered questions regarding commissions and other financial related issues she was abruptly taken off all toxicology related business and assigned to work the MDScripts Prescription Drug Monitoring Program (PDMP).  In that capacity, Joan was responsible for submitting all records of controlled substance dispenses to the appropriate state agencies and resubmitting errored records after correcting.

### *MDScripts Designates Joan as an Hourly Employee*

22.     Joan did not receive the promised bonuses and profit sharing in 2014.  Although she was on a salary, she was required to punch a time clock.  MDScripts warned her that she was to check out of the system after her eight-hour day and to keep track of overtime separately.

23.     Joan was became concerned that MDScripts was not living up to its compensation agreement and tried to address this with MDScripts' management.  Defendants ignored her inquiries for a time, but at an April 2015 company retreat in Chicago, Defendant Mounce announced a new bonus plan that was based on performance.  Because Joan was confident that her superior performance was in the range of Mr. Mounce's new compensation plan where she would be rewarded, Joan did not push the issue of her 2014 compensation.

24.      In or about May 2015. Joan sent a letter to MDScripts management to describing the achievements she had with the company.  Shortly thereafter, MDScripts assigned Joan back to the toxicology department and started to train her to generally support all MDS's customers (dispensing, billing, toxicology and reporting) to support a new help desk function to clients.  Purportedly because of the multiple task she was performing within the organization, on July 31, 2015, MDScripts changed Joan's pay status from salaried to hourly.

25.     In June of 2016, Joan was assigned the management of a new account, CareHere, that involved learning two new external systems supported by external companies as well as oversee all implementation of the system integration custom designed for this client by MDScripts.  The projected target completion date was 18 months, Joan completed the majority of the project three months early and exceeded all site build, dispensing and revenue expectations.  Joan's account grew to be the number one organization within MDScripts in its first year.

### *MDScripts Fails to Pay Joan for Overtime*

26.     At all relevant times thereafter, Joan was required to and did work in excess of 40 hours per week.  Although MDScripts required Joan to log in and out of its time tracking system, it told her to not report her overtime on its time log but rather, to record her hours separately.

27.     During, the 18 months of the CareHere project in particular Joan, was required to work a significant amount of overtime.  The workload was so heavy that at one point, Joan had ask her niece help her with data entry.

28.     MDScripts was aware of the number of hours Joan was working but did not provide her any help.  A typical work schedule during of over 60 hours per week was as follows:

| | |
|---|---|
| Monday: | 4am-11 or 12pm |
| | 2pm - 4 or 5pm |
| | 9pm- Midnight or later (14+/- hours) |
| | |
| Tuesday: | 4am-11 or 12pm |
| | 9pm- Midnight or later (11+/- hours) |
| | |
| Wednesday: | 4am-11 or 12pm |
| | 2pm - 4 or 5pm |
| | 9pm- Midnight or later  (14+/- hours) |
| | |
| Thursday: | 4am-11 or 12pm |
| | 9pm- Midnight or later  (11+/- hours) |
| | |
| Friday: | 4am-2:30pm (9+- hours) |

29.     MDScripts HR manager warned Joan that if she complained to Mr. Mounce, that she was risking her job.  Because of this and because of MDScripts's promise to pay bonuses and profit sharing, Joan was reluctant complain to MDScripts about its failure to pay her overtime.

30.     Without access to MDScripts system user logs or help desk history, Joan cannot determine the exact amount of overtime owed her by Defendants, but estimates that she typically

worked in excess of 60 hours per work week. Moreover, MDScripts discontinued the use of a time clock in May 2017, despite the fact Joan was an hourly employee.

31.     At various times, Defendants reaffirmed their promise to Joan that she would receive a significant bonus.

32.     At the end of 2015, MDScripts failed to comply with its promises to pay significant bonuses for performance even though Joan's performance equaled or exceeded the level of performance for its employees required by MDScripts.

33.     At the end of 2016, MDScripts again failed to comply with its promises to pay significant bonuses for performance even though Joan's performance equaled or exceeded the level of performance for its employees required by MDScripts.

34.     At the end of 2017, MDScripts again failed to comply with its promises to pay significant bonuses for performance even though Joan's performance equaled or exceeded the level of performance for its employees required by MDScripts.

35.     Finally, in or about July 2017, MDScripts announced that it would be eliminating paid vacations and that it would pay out all accrued and unused vacation time.

36.     At the time MDScripts's paid vacation policy was eliminated, Joan had accrued approximately 190 hours of unused vacation time, valued at approximately $6,080. MDScripts failed to pay Joan in full for her accrued, unused vacation time.

### *Defendants Retaliate When Joan Complains About Defendant's Failure to Pay Her*

37.     Joan's efforts with CareHere appeared to have paid off for Defendants as it soon became the top client for MDScripts. Defendants, however, did not reward Joan and as it had done in prior years, failed to pay her the promised bonuses and profit sharing.

38. On or about January 23, 2018, Joan sent Defendants a lengthy letter of grievances concerning Defendants' failure to pay her as promised and as required by law. A copy of the letter is attached hereto as Exhibit A.

39. The following day, and in retaliation for her complaint, Defendants notified Joan that her position had been terminated.

40. Defendants' conduct, as set forth in this Complaint, was willful and in bad faith, and has caused significant damages to Joan.

### COUNT I
### FAIR LABOR STANDARDS ACT
### (Overtime Claim)

41. Joan hereby incorporates by reference the foregoing paragraphs 1-40 of this Complaint as if fully set forth herein.

42. Section 7(a)(1) of the FSLA provides that:

(a) Employees engaged in interstate commerce; additional applicability to employees pursuant to subsequent amendatory provisions.

(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed. [29 USCS § 207.]

Section 16(b) of the FLSA provides, in pertinent part, that:

Any employer who violates the provisions of section 6 or section 7 of this Act [29 USCS § 206 or 207] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. … An action to recover the liability prescribed in the preceding sentences may be maintained against any employer (including a public

> agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. … The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

43. During the applicable statute of limitations, Defendants, pursuant to their policies and practices, failed and refused to pay the overtime rate to Joan for all overtime hours she worked.

44. Defendants violated the FLSA, 29 U.S.C. § 201 et seq., by failing to compensate Joan for her overtime hours.

45. Joan did not perform job duties or tasks that permit her to be exempt from overtime compensation as required under the FLSA.

46. By directing Joan not to fully record her hours and to separately maintain them, Defendants failed to make, keep, and preserve records with respect to their employees sufficient to determine their wages, hours, and other conditions and practice of employment, in violation of the FLSA, 29 U.S.C. § 201, *et seq*.

47. The foregoing conduct, as alleged herein, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

48. As a result of Defendants' violations of the FLSA, Joan has suffered damages for which she is entitled to recover the amount of all respective unpaid overtime compensation at a rate of one and one—half times her regular rate of pay for work performed in excess of forty hours in a work week over the past three years, plus liquidated damages, interest, attorney's fees, costs, and expenses of this action, to be paid by Defendants as provided by the FLSA, 29 U.S.C. § 216(b), and such other legal and equitable relief as the Court deems just and proper.

**COUNT II**
**RETALIATION (FSLA)**

49.     Plaintiff hereby incorporates by reference the foregoing paragraphs 1-48 of this

Complaint as if fully set forth herein.

50.     Section 15 of the Fair Labor Standards Act provides, in pertinent part, that:

> (a)     After the expiration of one hundred and twenty days
> from the date of enactment of this Act [enacted June 25, 1938], it
> shall be unlawful for any person—

> *       *       *

> (3)     to discharge or in any other manner discriminate
> against any employee because such employee has filed any
> complaint or instituted or caused to be instituted any proceeding
> under or related to this Act…. [29 USCS § 215(a)(3).]

51.     Section 16 of the FSLA provides, in pertinent part, that:

> Any employer who violates the provisions of section 15(a)(3) of this
> Act [29 USCS § 215(a)(3)] shall be liable for such legal or equitable
> relief as may be appropriate to effectuate the purposes of section
> 15(a)(3) [29 USCS § 215(a)(3)], including without limitation
> employment, reinstatement, promotion, and the payment of wages
> lost and an additional equal amount as liquidated damages. …. An
> action to recover the liability prescribed in the preceding sentences
> may be maintained against any employer (including a public
> agency) in any Federal or State court of competent jurisdiction by
> any one or more employees for and in behalf of himself or
> themselves and other employees similarly situated. … The court in
> such action shall, in addition to any judgment awarded to the
> plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by
> the defendant, and costs of the action.  [29 USCS § 216(c).]

52.     At various times during Joan's employment by Defendants, she was told that if she

complained about her wages, she would be terminated.  Joan, therefore, continued to tolerate

Defendants' failure to pay her overtime.

53. In January 2018, after Defendants had again failed to provide Joan with any meaningful bonus that represented her contribution to the organization, Joan sent a letter to Defendants outlining her grievances.

54. After receiving Joan's grievance letter, Defendant's terminated Joan's position. On information and belief, Defendants terminated Joan in retaliation for her complaining about her attempts to enforce her rights under the FSLA, in violation of Section 15 of the FSLA.

55. As a result of Defendants' violations of the FLSA, Joan has suffered damages for which she is entitled to reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages, plus liquidated damages, interest, attorney's fees, costs, and expenses of this action, to be paid by Defendants as provided by the FLSA, 29 U.S.C. § 216(b), and such other legal and equitable relief as the Court deems just and proper.

## COUNT III
## ILLINOIS MINIMUM WAGE LAW
### (Overtime Claims)

56. Plaintiff hereby incorporates by reference the foregoing paragraphs 1-55 of this Complaint as if fully set forth herein.

57. At all times relevant to this action, Joan was employed by Defendants within the meaning of the Illinois Minimum Wage Law, 820 ILCS § 105/1 et seq.

58. By the course of conduct set forth above, Defendants violated the Illinois Minimum Wage Law, 820 ILCS § 105/ 1 et seq., in particular, § 105/4a(1).

59. The Illinois Minimum Wage Law 820 ILCS § 105/ 1 et seq. requires employers, such as Defendants, to pay overtime compensation to all non—exempt employees.

60. Joan was a non—exempt employee entitled to be paid proper overtime compensation for all hours worked.

61.     During her employment with Defendants, Joan worked in excess of forty hours in a work week.

62.     While Defendants employed Joan, Defendants failed and refused to pay her proper overtime compensation.

63.     As a result of Defendants' failure to pay overtime wages earned and due Joan, Defendants violated the Illinois Minimum Wage Law.

64.     Because Defendants failed to properly pay overtime as required by law, Joan has suffered damages for which she is entitled under the Illinois Minimum Wage Law, 820 ILCS § 105/4a(1) and § 105/12 to all overtime compensation due to her at a rate of one and one half (1 1/2) times the regular rate of pay for all overtime hours worked in the past three years, and under 820 ILCS § 105/12 to recover liquidated damages, costs, and reasonable attorney's fees.

**COUNT IV**
**Illinois Wage Payment & Collection Act**
**(Failure to Pay Claims)**

65.     Plaintiff hereby incorporates by reference the foregoing paragraphs 1-64 of this Complaint as if fully set forth herein.

66.     The Illinois Wage Payment & Collection Act, 820 ILCS § 115/3 et seq., requires that "every employer shall be required, at least semimonthly, to pay every employee all wages earned during the semi—monthly pay period" and pay "final compensation" at the time of separation, if possible, or if not, by the next regularly scheduled payday for the employee.

67.     By the course of conduct set forth above, Defendants failed to pay Joan all wages due in violation of the Illinois Wage Payment & Collection Act, 820 ILCS § 115/3 et seq.

68.     Because Defendants failed to properly pay wages due as required by law, Joan suffered damages for which she is entitled to recover all wages due her, two percent (2%) interest

per month on all wages due until fully paid, her costs, her reasonable attorney's fees, and all such

other and further relief as this Court deems right and just.

**COUNT V**
**RETALIATION UNDER THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT**

69.     Plaintiff hereby incorporates by reference the foregoing paragraphs 1-68 of this

Complaint as if fully set forth herein.

70.     Section 14 of the Illinois Wage Payment and Collection Act provides, in pertinent

part, that:

> Any employer, or any agent of an employer, who discharges or in
> any other manner discriminates against any employee because that
> employee has made a complaint to his employer … that he or she
> has not been paid in accordance with the provisions of this Act … is
> guilty, upon conviction, of a Class C misdemeanor.  An employee
> who has been unlawfully retaliated against shall be entitled to
> recover through a claim filed … in a civil action … all legal and
> equitable relief as may be appropriate.  In a civil action, such
> employee shall also recover costs and all reasonable attorney's fees.
> [820 ILCS § 115/14.]

71.     At various times during Joan's employment by Defendants, she was told that if she

complained about her wages, she would be terminated.  Joan, therefore, continued to tolerate

Defendants' failure to pay her overtime.

72.     In January 2018, after Defendants had again failed to provide Joan with any

meaningful bonus that represented her contribution to the organization, Joan sent a letter to

Defendants outlining her grievances.

73.     After receiving Joan's grievance letter, Defendant's terminated Joan's position.  On

information and belief, Defendants terminated Joan in retaliation for her attempts to enforce her

rights under the Illinois Wage Payment and Collection Act, in violation of 820 ILCS § 115/14.

74.     As a result of Defendants retaliating against Joan in violation of Section 14, Joan

has suffered damages for which she is entitled under the Illinois Wage Payment and Collection

Act to all legal and equitable relief, including but not limited to lost wages and reinstatement, plus costs, and reasonable attorney's fees.

### COUNT VI
### BREACH OF CONTRACT

75.     Plaintiff hereby incorporates by reference the foregoing paragraphs 1-74 of this Complaint as if fully set forth herein.

76.     When Joan was hired, MDScripts promised her an annual salary, plus profit sharing and bonuses that met or exceeded $75,000.

77.     MDScripts promise of an annual salary, plus profit sharing and bonuses that met or exceeded $75,000 is a valid and enforceable agreement.

78.     During MDScripts annual company retreat in 2015, MDScripts again promised Joan that her an annual salary, plus profit sharing and bonuses that met or exceeded $75,000.

79.     Despite performing all tasks required of her by MDScripts, MDScripts failed and refused to pay her the promised compensation.

WHEREFORE, Plaintiff Joan Shages prays for relief as follows:

For violation of the Fair Labor Standards Act and Illinois wage and hour laws, judgment in her favor and against Defendants MDScripts Inc. and Gary Mounce in an amount equal to Joan's unpaid minimum wages and overtime wages at the applicable rates; a finding that Defendants' conduct was willful; liquidated damages; pre—judgment and post—judgment interest as provided by law; all other allowable damages; and all costs and attorney's fees incurred prosecuting these claims, including expert fees; and all such further and additional relief as the Court deems just and equitable.  For breach of contract, judgment in her favor and against Defendants MDScripts Inc. and Gary Mounce in an amount equal to all unpaid wages, including fair bonuses, unpaid wages and profit sharing.

**Demand for Jury Trial**

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial pursuant to Federal Rule of Civil Procedure 38(b).

Dated August 8, 2018                                         JOAN SHAGES


                                         by:_____/s/ Steven S. Shonder_____
                                                         One of her Attorneys

Steven S. Shonder
LAW OFFICES OF STEVEN S. SHONDER
1 E. Wacker Drive, Suite 2350
Chicago, Illinois 60601
(312) 612-5191
ARDC No. 6238090

# EXHIBIT A

Hello Gary, Theo and Jeff,

Writing this letter has been very difficult. In my 25-year career I have only had to approach one other boss regarding lack of promised compensation; that was Walter Hoff. My employment history is consistent and verifiable; I have always been ambitious, reliable and hardworking. In all previous employment, financial and career advancement were awarded ahead of schedule and without asking because my performance was always exceptional. I have delivered the same impeccable performance at MDScripts. I am very disappointed about my bonuses, lack of financial compensation for lost vacation time and consistently diminishing compensation package that is already $40,000 below industry standards for a mid-range performer with similar background. I am not a mid-range performer. I am addressing the three of you because I am very concerned and confused with what appears to be my lack of value to, and my future with, MDScripts.

I don't know if my resume was reviewed four years ago but I have been formally trained in upper management positions at two global companies. When promoted into management at PepsiCo it was compulsory to attend the campus based BMT Program (Basic Management Training). This training was intense 6 month classroom based courses in human resources, federal labor laws, sexual harassment laws, productivity, sales, labor, training, cost management and other management skills. This training was required by the company before ever being allowed to hold a supervisory position. At JPMorgan the onboarding for management positions was a comprehensive three months, outlining very similar coursework as PepsiCo. While I use many skills from past employment at MDScripts every day, my professional knowledge and management experiences seem to have been overlooked or forgotten.

When negotiating my starting salary in 2014, I indicated I needed $75,000 per year to start. At the time, market wide, $75,000 was the <u>lowest</u> starting compensation package for a Senior Relationship Manager with a similar background. I thought it was an agreeable starting point as I had never worked for a software company and knew I had to learn other MDS platforms. My proposal was countered with an offer of "$60,000 base salary and the difference in bonuses and profit sharing". I was also told that compensation would never be an issue at MDScripts; "raises, bonuses and profit sharing were frequent and generous if earned". I trusted MDScripts verbal commitment and agreed to the terms as I was confident my performance would speak for itself. Despite numerous accomplishments with our company in the last four years (outlined at the end of this document) and MDScripts enormous market and financial success, these compensation promises have not been kept and other benefits have been taken away.

In October of 2015 I emailed Gary twice requesting explanation of my pay change, lack of bonus and an overall compensation review. I never received a reply and was never contacted to discuss. When I received no answer I asked my supervisor and human resources/payroll about my salary changes, pay for overtime and bonuses. I was told "Gary handles that, and if you value your job you won't ask". Why would I be told this? This was a troubling response from a person in position of authority. Since not receiving my full bonus, pay raises or any profit sharing in 2014 and 2015 and having been told multiple times that asking would result in my dismissal; I knew I would have to be proactive in seeking and *documenting* all feedback from my supervisor regarding my performance and expectations moving forward. Since early 2016 I have records to show that I have been told my performance was above average and was even told many times that I was working "*too hard*". How could I be working "*too hard*" but not be getting bonus, profit sharing, or raises?

**EXHIBIT A**

When Zopim helpdesk and chat launched I had many documented conversations with my supervisor instructing me to *UNDERPERFORM.* I was told that my (excellent) performance would set unrealistic expectations for our clients in the long term. I explained that *in my experience* (trainer at JPMorgan for their international commercial accounts call center), it was possible to process hundreds of chats per day and still take tickets and calls on systems more complex than ours. I suggested we were managing our help desk and ticket allocation inefficiently and could process more tickets if we set handling rules that were uniformly followed. It was then that I was told that the real reason I was being asked to go slower was because it was making another agent feel insecure with their own performance. I was told I was "stepping on toes". I offered to help to be more proficient on the help/chat system as I was already familiar with optimizing this process. I was told this agent wanted to do things "the old fashioned way, to ensure job security". Isn't intentionally ignoring available technology and processes that increase productivity the same thing as wasting time? I know many of the features we are paying for with this external help desk are going unused and now the platform is nothing more than a copy of what we had on MDS. Why pay for a more advanced system and not use it? I told my supervisor that I would not deliberately underperform and I suggested finding a project to divert my attention. I insisted the project be something where my performance and results could be measured and non-subjective; a week later Theo gave me the CareHere project.

Many times throughout the CareHere project I questioned if it was assigned to encourage me to quit. I was told when I was hired that I would never have to work directly with my old boss Walter Hoff, but I was taking orders from him, receiving calls at all hours of the night and enduring documented harassment. Several times in 2017 I approached my supervisor to ask for additional help with data entry, explaining that the CareHere project required more manpower and pleaded that someone be trained to manage the account in my possible absence (vacation). I was told it was now considered a "worthless project" and that "it didn't have full upper management support". I was told the project was costing the company money and my continued participation was discouraged. I was advised to "reduce efforts to a minimum and cut my losses". I asked where my resources would be allocated after CareHere and I was not given an answer. My supervisor never gave me another assignment. The calls and demands from CareHere kept coming in, no one else was trained and the job was never shifted to ASM (as discussed). I carried on, more than 75 hours per week alone.

Both Gusto and Zenefits have my employee profile as an hourly employee. Throughout my employment with MDS I have used two online time keepers one requested by the company (later discontinued) and one of my own because I was told not to let overtime accumulate on the Zenefits site. I stopped calculating the overtime dollar amount on the project's one-year anniversary in September but worked and kept records of overtime hours until December. The time card report shows an <u>average</u> weekly overtime amount of 32 hours (<u>after</u> federally required lunch and break deductions were removed by the program); $79,872 worth of documented overtime where tasks and time can be verified over help desk tickets, emails, spreadsheet time logs and Clinician help desk tickets.

At Thanksgiving I enthusiastically told my relatives about my professional accomplishments and how all the time spent and sacrifice made over the year was finally paying off. My account had finally reached number one on Thanksgiving morning and my sense of value to the company seemed validated. That sense of success was supported by two letters from Theo commending me on a job well done with CareHere (that meant a lot to me). Three weeks later I literally had the wind knocked out of me when I opened my bank account and saw a net $1800 bonus. Without exaggeration and for several days I couldn't catch my breath, heart pounded, and hands shook uncontrollably, completely confounded. MDScripts had their best year ever; all reports show CareHere volume and revenue had a direct positive impact on that record setting year. I was the only person

working the CareHere account. It is beyond my comprehension how management determined I earned HALF as much bonus as last year. Unlike my celebratory Thanksgiving, Christmas was spent quite differently.

After weeks of trying to compose myself over the bonus, I hoped the vacation compensation that was promised would be on my final check of 2017. I was called shortly before the 2017 retreat and told about the new "no vacation policy" going into effect immediately. (This was one of three total calls made to me by anyone in upper management at all in 2017.) I was told that all employees with accrued unused time would be paid out. The last screen shot and report I have from Zenefits prior to vacation time disappearing showed nearly 190 hours of earned and unused vacation time. At the time of the call, I was only placated by the 10% hit to my consistently diminishing bottom line because I understood I would be compensated. That vacation time was worth $6080 to me and I counted on it. That payment never came. There was no reason for me to expect anything but my full promised bonus and profit sharing as well as my earned and unused vacation time that I was told I would be compensated for this year, totaling $21,000. $1800 net was more than disappointing, it was alarming.

I expect MDS will issue the financial compensation owed for my accrued and unused vacation time right away. I would appreciate a review of my bonus, profit sharing or written explanation as to why I am not receiving bonus and profit sharing proportional to my documented performance, skill development and tenure. I would also like documentation regarding the profit sharing program overall as I have never received this benefit and it was a part of my original employment agreement. If I am not eligible to receive the profit sharing and bonuses promised when I was hired my overtime should be addressed and paid.

Moving forward, I would like to discuss my compensation package and employment agreement as most of the contents in the original have been eliminated or not honored. Because these past promises and agreements have not been kept I will need written guidelines with clear expectations outlining salary, benefits, time off and performance commitments as evidence shows my performance surpassed previous expectations and commensurate reimbursement was not issued.

I genuinely love my job; so much so that I have delayed this conversation for too long under the threat of losing it. I am very good at what I do and have been a loyal, low maintenance, self-reliant and dedicated employee. It has been my sincere pleasure to work hard and achieve documented outstanding results for this company; I only expect my commitment and investment be met with equal commitment and investment.

**Compensation promises made and not kept**:
- Paid vacation
- Bonus and profit sharing of $15,000/year or more
- Annual reviews and generous pay increases
- Payout on accrued vacation time taken without warning in 2017
- Commission program for selling supplies introduced at retreat 2015, never paid out
- Commission program for moocher/inactive accounts introduced after retreat 2016, never brought to fruition
- Commissions or bonus for promoting Sun Dental discussed at 2017 retreat
- Every year we are told there will be a new way to earn more money but it never evolves

**Compensation History with MDS:**

**2014 Bonus:** **$1000**, Total compensation 2014: **$29,846.** (employed six months)

**2015 Bonus:** **$1000,** Total compensation 2015: **$60,525** WITH bonus. (-**$14,475** salary of $75k)

This was also the year my compensation was changed from salary to hourly without explanation.

2015 Accomplishments:

Working knowledge of RxB and MDS

Admin/trainer level knowledge of MDP

Spent 70+ hours per week for six months on PMP, no overtime, no promised bonus or profit sharing

**2016 Bonus:** **$4500** (Oct and Dec), Total compensation 2016: **$67,819** with bonus (-**$7181** salary of $75k)

2016 accomplishments:

Dominated new helpdesk and chat, learned all systems in depth to navigate/troubleshoot faster. I did this by researching answered tickets on my own time and by trial/error. Training level knowledge of MDS, MDP, and PMP. Working level knowledge of RxB

Started CareHere project in September 2016 and had 70-80-hour work weeks from that point forward.

**2017 Bonus:** **$2500,** Total compensation 2017: **$68,550** with bonus (-$6450 salary of $75k, approx. -$6000 vacation = -**$12,450**. *I nearly made **LESS** than the 2016 and had my earned vacation taken away too.*

$1.50/hour increase as of March 15, 2017 ($3120 annually @ 86.67 hours/pay period, 24 pay periods)

Learned Clinician (front end and back end)

Built 200+ sites, 400+ providers and countless users in 2 systems resulting in top producing Org

Was only support to all CH live sites

Reached top 5 on Org list in 6 months, number 1 in 13 months

***Since being hired I am behind nearly $35,000 from what was promised and that does not include any overtime or anticipated "generous" pay increases. I don't know any professional that would not inquire over that kind of salary discrepancy, why I was told I would lose my job for doing so, still confuses me.***

**Professional Achievements/Benefits I bring to MDS:**

- I am the only agent servicing clients on **ALL** platforms including MDS, MDP, RxB, PMP *and* Clinician
- I am the only agent trained on Clinician (User side and Admin side)
- I require **no** company contribution on health insurance or 401k (Thousands in savings)
- I built a number 1 producing Org from scratch, in 13 months, with over 200 sites, 600 providers and countless users that required set up in two systems, alone
- I am the only agent to service 90% CareHere tickets (more ticket volume than top 4 orgs **combined**)
- I took no more than two consecutive days off from Oct 2016 until January 2018
- I am the only agent certified with clinical experience (lab/med tech, phlebotomy CPT, MA)
- I am the only agent professionally trained to manage a high-volume ticket, call and chat service center
- I have more than two successful decades of experience in operations management, training, sales, and client relationship development
- I can provide several written citations from current MDS clients commending my tireless determination and superior service